**Affirmed and Opinion Filed October 6, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00773-CV

### IN THE INTEREST OF R.R. AND J.V., CHILDREN

**On Appeal from the 254th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF11-02361-R**

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Myers
Opinion by Justice Francis

Rogelio Villa a/k/a Jose Lopez (Father) appeals the trial court's order in this suit affecting the parent-child relationship. In two issues, Father contends the trial court abused its discretion by naming the children's mother, Bertha Ramirez, sole managing conservator of the children and by finding he was voluntarily underemployed and basing his child support obligation on a finding that he was a diesel mechanic. We affirm.

Father and Mother began living together in 1996 and had two children during their thirteen-year relationship: a son, R.R., born in 2000, and a daughter, J.V., born in 2002. According to Mother, Father was emotionally and physically abusive. She described incidents between 2004 and 2007 in which Father hit her, knocked holes in the wall, and pulled a gun on her and the children. The incidents were witnessed by the children. Mother was treated at hospitals in 2004 and 2006 after Father injured her; in neither instance, however, did she report the abuse to hospital personnel. In the 2006 incident, Mother acknowledged that she was

arrested by the police for Class C misdemeanor assault–family violence. The police report indicated the argument began because Father was cheating on Mother, and Mother scratched Father on the arm. Mother pleaded guilty and completed deferred adjudication probation.

Father left Mother in March 2009 and did not return. After that, she said the children did not hear from or see their Father for a year. Mother filed this suit in February 2011. Initially, she said Father had unsupervised visitation, but the children cried and screamed and did not want to see him. The trial court ultimately suspended visitation and then ordered supervised visits, first at Family Living Place and then at Hannah's House - facilities that monitor supervised visitations between parents and children. Neither place was successful in reunifying the children with Father, and the court ordered family therapy, which Mother said also did not "work out." Mother testified she tried to get the children to cooperate in counseling, but acknowledged she had been sanctioned for missing appointments. Finally, she told the court she wanted her children to have a healthy, safe relationship with Father but was "scared."

Father testified he never abused Mother or the children. He believed Mother had poisoned the children against him because she was jealous after he married another woman. To support this claim, he went through a series of photographs, taken during visits with him in late 2010, in which the children were smiling and appeared to be happy. He was not "proud" that that he went through a period of "several months" where he did not see his children. But, he testified he attended every scheduled visitation at FLP and Hannah's House as well as every family counseling session in attempt to reunify with his children. He said he loves his children and was not going to "give up."

In addition to Mother and Father, several family services providers also testified on the issue of the children's relationship with Father. Sharyl D. Terhall, a social worker, conducted a

court-ordered emergency interview of the children and a social study, and filed reports with the court several months before trial.

Terhall interviewed the children in June 2011. At the time, they were nine and ten years old. From the beginning, they referred to Father as "the guy" and "the man." When Terhall asked why they referred to him that way, they said he was "mean" and they had seen him "hurt" Mother. The children told Terhall they had seen Father physically abuse Mother more than once when they were all living together, including beating her head against the wall and a concrete floor, wielding a knife at her, and threatening to "kill them all" with a gun. Terhall said the children were "very emotional" and shredded tissues as they recounted the stories. Terhall said their demeanor seemed "genuine" and uncoached. Both children told Terhall they did not want to see Father, even under supervised conditions, because they were afraid of him. Although she said she said she did not know whether Mother or Father was telling the truth, she believed the children, believed they were "scared," and said that their fears needed to be addressed. Terhall said the children could sustain "significant harm" if forced to have unsupervised visitation with Father before they had a chance to work through their fears in counseling.

About six months after Terhall's interview, FLP began providing supervised visitation services to the family. According to Christina Coultas, FLP program director, the children told staff workers they were afraid of Father and refused to visit him. FLP tried to make the children feel "safe" and Mother also tried to encourage them, but after three unsuccessful attempts, FLP terminated the parties' participation in the program.

After the failure at FLP, the court ordered supervised visitation at Hannah's House. The facility's director, Betty Stone, testified staff workers supervised ten visits between Father and the children, but the children were "scared to death." According to Stone, children usually sit in a large room with the visiting party and play games or watch a movie while two supervisors stay

in the room and monitor the interaction. With R.R. and J.V., however, each visit was a "chore" just to get them to the visitation room. Stone said when the children arrived, they were "so overcome with fear" that they would cling to Mother and could barely walk in the building. After Mother left, the children would bury their faces in their hands. Although staff tried to determine why they were so upset and angry, the children would not talk to them. Once in the visitation room, Stone said the children would become upset when Father entered the back of the room and tried to talk to them. Nevertheless, Stone said, Father would stay the entire time of the scheduled visits and did whatever was necessary to reunite with the children.

According to Stone, Mother did not bring the children to four scheduled visits. At one point, Mother's original counsel wrote a letter to Hannah's House, which accused workers of "being mean" to the children and warned that they "had no business ever touching them." Stone acknowledged it was possible that staff told the children that Mother could go to jail if they did not visit with Father.

After the lack of success at Hannah's House, the court ordered the children to begin counseling with a family therapist. During this same time, the children began individual counseling with Leslie Kuerbitz, who provided play therapy in ten or eleven one-hour sessions. At the time, R.R. was eleven years old and J.V. was ten. Kuerbitz testified R.R. was "very angry" and J.V. was "very fearful." She said the children's emotions were appropriate to the issues discussed and she did not believe they were "parroting" someone else.

The children told her Father had pulled a gun and threatened to kill them and Mother, but he "backed off" when another relative came into the home. They also said they had seen him hit Mother and pull her hair. R.R. indicated he wanted to "move dad out of [his] life" while J.V. said she wished her "dad never existed." The children told Kuerbitz about their Father's new home, and Kuerbitz said they saw a disparity between his new household and their own and were

–4–

upset that Father would treat a new woman and her children "so much better than he could treat them." While Father was "hit or miss," Kuerbitz said Mother was the "one stable parent" in their lives and they loved her very much.

In addition to testimony regarding conservatorship issues, Mother and Father testified about Father's work history and earnings. The evidence showed Father had been working illegally in this country for twenty years under the name of Jose Lopez. Mother said he owned a trucking company, J.L. Trucking, from 1999 to 2009. The company started with one eighteen-wheeler truck and expanded to three. She said Father still had the business when they separated in 2009.

In contrast, Father testified he closed his trucking company in 2007, although a tax Form 1099 was admitted into evidence showing his company earned $173,071.11 in 2008. When he closed his business, Father said he gave the three trucks to his father, although the trucks remain on his property. He said he earned $10,000 in 2008 and in 2009 working for his father, but has since been unemployed because he is trying to gain legal status and had been advised not to use any false names. He said he helps his wife run her trucking business, which opened in 2011, and does maintenance on the trucks at the company. He estimated the value of his services to the company at $400 a week "to do maintenance on the trucks" and asked the trial court to assess child support at 25 percent of that value.

When asked the percentage of time spent on maintenance as opposed to other tasks, Father said:

> It would be maybe once a week when you do maintenance. Depends on how often they broke down. They not gonna break down all the time, but maintenance is only once a week.

At another point, he estimated he worked thirty hours a week doing maintenance on the trucks, "depending on how often they break." Later, he said he only put air in the tires and water in the washer reservoirs. He said he was not a certified mechanic and had never been trained as such.

The trial court admitted a printout from the Bureau of Labor Statistics showing the mean annual wage for a bus or truck mechanic or a diesel engine specialist was $43,660. Finally, Father testified he owns a home on five acres in Cedar Hill that he purchased in 2007 but said his wife pays the $2400 mortgage. He also owns two vehicles, a 2008 Ford F-250 and 1997 Chevrolet.

Two months after the trial, the judge issued a written decision finding it "extremely difficult" to determine who was "telling the truth regarding family interactions over the past six years." He said it was unclear whether the children actually witnessed family violence or threats, but that it was clear the children have "overwhelming fear/animosity/mistrust of their father." Further, the judge stated that it was unclear whether "the children's feelings stem from indoctrination by the mother or actions of the father . . . ." Saying his decision was designed to "safeguard the children," the judge appointed Mother sole managing conservator and Father possessory conservator and directed the parties to cooperate in reunification therapy. He also found Father was voluntarily underemployed or unemployed and ordered child support based on earnings as a diesel mechanic.

The trial court's rulings were incorporated in the final judgment. The trial court specifically found no pattern of child neglect or family violence by any party to this case within two years preceding the filing of this case or during the pendency of the case. With respect to child support, the trial court found Father had a taxable income of $173,000 in 2008. Further, it found Father is a diesel mechanic, whose skill level is billable at $30 an hour, and the national average annual wage for diesel mechanics is $43,660, Texas's annual mean wage is $40,460, and

Dallas's mean annual wage is $42,310. The trial court further found Father is capable of earning $3,526 monthly gross wages and had net resources of $2,869.44, and calculated his child support obligation at $692 per month.

In his first issue, Father contends the trial court abused its discretion by naming Mother sole managing conservator of their children. Within this issue, Father complains the trial court (1) allowed Mother to present evidence at trial that was not disclosed in discovery and (2) failed to apply the proper legal standard to the conservatorship determination.

We begin with Father's discovery complaint in which he asserts the trial court improperly allowed two witnesses—Terhall, the social worker who conducted the social study and the emergency interview of the children, and Kuerbitz, the children's therapist—to testify at trial. He argues both witnesses should have been excluded because Mother failed to timely disclose them as persons with knowledge of relevant facts or to designate them as experts.

Under rule 193.6 of the Texas Rules of Civil Procedure, a party may not offer the testimony of a witness who was not timely disclosed in response to a discovery request unless the court finds good cause for the failure to timely make, amend, or supplement the discovery response or that the failure will not unfairly surprise or prejudice the other parties. TEX. R. CIV. P. 193.6(a); *see Fort Brown Villas III Condominium Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 881 (Tex. 2009) (per curiam). The burden is on the party seeking to admit the evidence to establish good cause or the lack of unfair surprise or unfair prejudice. TEX. R. CIV. P. 193.6(b); *Fort Brown Villas III Condominium Ass'n*, 285 S.W.3d at 881. It is within the trial court's discretion to determine whether the party has met this burden. *Spurk v. Tex. Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 213 (Tex. App.—Austin 2013, no pet.).

At the time Terhall was called to testify, Father was asked if he would stipulate to her qualifications. Father's counsel responded that since Terhall was appointed by the court, he had

"no objection to that." Terhall testified without objection that she (1) spent four to five hours with the children and conducted the social study and emergency interview; (2) believed the children's statements were "credible" and were "related to direct memories" as opposed to what they were told; and (3) had "reason to conclude" that it was "highly probable" Father had been violent with Mother. She said the children (1) reported to her that Father had threatened to take them from Mother and that they had seen threats and violence; (2) were fearful of Father and reported they "peed themselves a lot"; (3) reported that Father had threatened them with a knife and gun; (4) were emotional and shredded tissues as they talked about the subject, indicating anxiety; and (5) were afraid of Father and did not want him in their lives. Terhall further testified without objection that during an observation of visitation, the children were tearful and she ended the visitation because she did not see the benefit to prolonging it. As a result of her evaluation, she concluded it was in the children's best interest for any access by Father to be in a counseling or supervised setting. During this testimony, the trial court took judicial notice of Terhall's social study and admitted her interview report into evidence, both without objection from Father. After all of this testimony and documentary evidence came in, Terhall was asked about her opinion as to whether Mother was cooperative in developing a relationship between Father and the children. It was at this point Father objected for the first time and raised the failure to respond to discovery.

On appeal, Father complains Terhall was improperly allowed to give opinions on the truthfulness of the children's statements, the validity of the allegations of violence and fear, and the appearance of the Mother's efforts to cooperate during the process of conducting the study. Mother responds that Father waived his complaint by stipulating to Terhall testifying as an expert and by failing to object at the beginning of the testimony. We agree with Mother.

Texas Rule of Appellate Procedure 33.1 requires a party to make a timely objection in the trial court to preserve a complaint on appeal. TEX. R. APP. P. 33.1(a). Here, appellant first stipulated to Terhall testifying as an expert and then allowed her to testify on most of the very subjects he complains about on appeal before raising any objection. Under these circumstances, we conclude his objection was untimely and he has waived any complaint regarding Terhall.

With respect to Kuerbitz, Father complains she was allowed to disclose information learned as a result of her counseling sessions with the children, including their statements about how they felt about their father, and to opine on the veracity of the children's statements and the lack of coaching by Mother.

Kuerbitz was the children's only counselor in this case. The record shows that when Kuerbitz was call to testify, Father's attorney objected that he was unaware Kuerbitz was counseling the children until recently and Mother had not disclosed her as a witness. Mother's attorney, however, represented that the social study, which had been on file for months, included Kuerbitz's report, curriculum vitae, and letter. Further, at Mother's deposition one month earlier, Father's attorney asked who would be testifying at trial, and Mother told him "Ms. Leslie." Finally, Kuerbitz told the judge she had previously been subpoenaed and had been ordered by the judge to appear in this case on this date. The trial court determined Kuerbitz was named in the social study, and then adjourned the case for one week.

When the case reconvened, Father again sought to exclude Kuerbitz's testimony on the ground she was not disclosed and "no opinions were itemized." Father acknowledged Kuerbitz was included in the social study but said that fact was not sufficient to provide notice she would testify. After lengthy argument by both sides, the trial court overruled Father's objection and allowed Kuerbitz's testimony.

–9–

Having reviewed the record, we cannot conclude the trial court abused its discretion in allowing Kuerbitz to testify. Kuerbitz was the only counselor of the children (although there was a family therapist), her report was part of the social study, and she was identified to Father as a witness at a deposition one month before trial. Moreover, the trial court adjourned the trial for week allowing Father additional time to prepare for the witness. Under these circumstances, the trial court could have properly concluded Mother's failure to timely make, amend, or supplement discovery responses to identify Kuerbitz as a witness could not have unfairly surprised Father. We conclude Father's complaint as to Terhall and Kuerbitz is without merit.

Father next asserts the trial court abused its discretion by denying him the status of joint managing conservator. He argues the trial court did not find family violence had occurred during the two years before suit was filed, but did find Mother harbored "deep feelings of resentment and anger" towards Father and "the children were fearful of their father based on the allegations made by the Mother." From this, he contends the findings prove parental alienation, not a history of violence in the home, and the trial court therefore abused its discretion by "allowing [Mother] to abuse the system, indoctrinate her children, and still be awarded sole managing conservator status."

We review a trial court's decision on conservatorship for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). The test for an abuse of discretion is whether the trial court acted in an arbitrary and unreasonable manner or whether it acted without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). In family law cases, the abuse of discretion standard overlaps with traditional sufficiency standards of review; as a result, legal and factual sufficiency are not independent grounds of error but are relevant factors in our assessment of whether the trial court abused its discretion. *In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.). The trial court does not abuse

its discretion if some evidence of a substantial and probative character exists to support the trial court's decision. *In re S.E.K.*, 294 S.W.3d 926, 930 (Tex. App.—Dallas 2009, pet. denied). The trial court is in the best position to observe the witnesses and their demeanor, and we give the court great latitude when determining the best interest of the child. *Id.*

In Texas, the primary consideration in determining conservatorship and possession of and access to the child is the best interest of the child. TEX. FAM. CODE ANN. § 153.002 (West 2014); *In re V.L.K.,* 24 S.W.3d 338, 342 (Tex. 2000). The trial court may appoint a sole managing conservator or joint managing conservators. TEX. FAM. CODE ANN. § 153.005(a). But, the trial court is required to presume that the appointment of both parents as joint managing conservators is in the best interest of the child until evidence is presented to rebut this presumption. *See* TEX. FAM. CODE ANN. § 153.131(b). The party seeking appointment as sole managing conservator has the burden to rebut the presumption. *Lide v. Lide,* 116 S.W.3d 147, 152 (Tex. App.—El Paso 2003, no pet.).

When, as here, the parents do not file an agreed parenting plan, the trial court may render an order appointing the parents joint managing conservators only if the appointment is in the best interest of the child. TEX. FAM. CODE ANN. § 153.134(a). In making its determination, the trial court is to consider the following factors:

(1) whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators;

(2) the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest;

(3) whether each parent can encourage and accept a positive relationship between the child and the other parent;

(4) whether both parents participated in child rearing before the filing of the suit;

(5) the geographical proximity of the parents' residences;

–11–

(6) if the child is 12 years of age or older, the child's preference, if any, regarding the person to have the exclusive right to designate the primary residence of the child; and

(7) any other relevant factor.

*Id.*; *In re Marriage of Butts*, 444 S.W.3d 147, 154–55 (Tex. App.—Houston [14th Dist.] 2014, no pet.). A finding of a history of family violence involving at least one of the parents of a child removes the presumption that a joint managing conservator is in the best interest of the child. *Id.* § 153.131(b).

Father has not discussed any of the above statutory factors; rather, it appears he is arguing that without a finding of family violence, Mother failed to rebut the presumption in favor of awarding joint managing conservator status to both parents. We disagree.

We acknowledge that in his order, the trial judge specifically found "there has been no pattern of neglect or family violence by any party to this case within two years preceding the filing of this case or during the pendency of this case." Moreover, the trial judge previously explained in his written decision that he found it "extremely difficult to determine who is telling the truth regarding family interactions over the past six years." And while the judge found it "unclear" whether the children actually witnessed family violence or threats or acting out by Father, it was "clear" that the children had an "overwhelming fear/animosity/mistrust" of him.

Initially, we note the only evidence in this case shows family violence, if any, occurred more than two years before Mother filed her petition. Nevertheless, the evidence showed the children were traumatized by the thought of visiting Father and appeared to be genuinely afraid of him. In an effort to reunify children with Father, supervised visitation was ordered at FLP and Hannah's House. FLP terminated the parties' participation in the program after only three attempts because the children refused to visit with Father even though staff tried to make them feel safe and reassure them. Likewise, attempts at Hannah's House were unsuccessful. The

director testified the children were "scared to death" and were "so overcome with fear" they could barely walk in the building. The children's play therapist, Kuerbitz, testified R.R. was "very angry" and J.V. was "very fearful." R.R. indicated in play therapy that he wanted to "move dad out of [his] life" while J.V., in her assessment, said she wished her "dad never existed." At the time, R.R. was just shy of twelve years old, and J.V. was ten.

Finally, Terhall said she did not know whether Mother or Father was telling the truth, but she believed what the children told her and that they were "scared" and the fear needed to be addressed. In addition to this evidence, Mother testified that when she and Father were together, she provided the care for the children: she fed them, put them to bed at night, and took them to their swimming lessons, sports events, choir, and Bible studies. After Father ended their relationship, he went a year without contacting his children or seeing them.

Keeping in mind that the primary consideration in a conservatorship determination is the children's best interest and applying the statutory factors to the above evidence, we conclude at a minimum factors (1), (2), (4), and (7) weigh in favor of the trial court's decision. Specifically, given the children's fear of Father, their physical, psychological, and emotional needs and development would not benefit from appointing their parents as joint managing conservators. Nor does it appear the parents could reach shared decisions in the children's best interest given that evidence suggests little communication between the parties. For example, Mother did not know the name of the children's stepmother until a month before trial even though the stepmother had been married to Father for more than two years. Finally, the evidence also showed Mother has always been the children's primary caregiver. And while there may have been controverting evidence, the trial court was in the best position to observe the witnesses and their demeanor. *See In re S.E.K.*, 294 at 930.

In reaching our conclusion, we cannot overemphasize that in custody matters, where personal observation and evaluation of the parties and their claims is so valuable, we vest great deference in the trial court's judgment. *See Doyle v. Doyle*, 955 S.W.2d 478, 481 (Tex. App.— Austin 1997, no pet.). In apparent recognition of the children's feelings toward Father and the desire to "safeguard the children," the trial court awarded sole managing conservatorship to Mother but made provisions for supervised visitation and continued counseling in an effort to reunify the children with Father. Because some probative evidence exists to overcome the presumption that joint managing conservatorship is in the children's best interest, we conclude the trial court did not abuse its discretion in awarding Mother sole managing conservatorship of R.R. and J.V. We overrule the first issue.

In his second issue, Father argues the trial court erred in finding he was voluntarily underemployed or unemployed and assessed child support on the basis he was a diesel mechanic when no evidence supports this finding.

A trial court has discretion to set child support within the parameters provided by the family code. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011). The family code provides that "[i]f the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment, the court may apply the support guidelines to the earning potential of the obligor." TEX. FAM. CODE ANN. § 154.066(a) (West 2014). In child support decisions, the "paramount guiding principle" of the trial court should always be the best interest of the child. *Iliff*, 339 S.W.3d at 81. Once an obligor has offered proof of his current wages, the obligee must demonstrate the obligor is intentionally unemployed or underemployed. *Id*. A court may consider the obligor's proffered rebuttal evidence of the reasons for his intentional unemployment or underemployment. *Id*

On appeal, Father relies on evidence (1) he is unemployed, (2) his assets are limited, and (3) he was never employed or trained as a mechanic. Additionally, Father asserts the trial court "discriminated against [him] by failing to weigh [his] ability to work legally in this country" and complains, without citation, that evidence from the Department of Labor was not admissible.

Having reviewed the evidence, we cannot conclude the trial court abused its discretion by finding Father was intentionally unemployed or underemployed nor was it an abuse of discretion to assess child support on the basis that Father was a diesel mechanic. The evidence in this case shows that Father earned $173,000 in 2008, the year before he ended his relationship with Mother and moved out. After that, he closed his trucking business and claimed he gave away his three eighteen-wheeler trucks, although they remained on his property. He also claimed to earn only $10,000 in each of the next two years while working with his father. Then, in the year Mother filed this lawsuit, he stopped earning money all together, saying he worked thirty hours a week in his wife's newly established trucking business but was not paid. Appellant testified during those thirty hours, he did maintenance on the trucks when they broke down. But then later in his testimony, he claimed he did not perform mechanical work and only put air in the tires and water in the washer reservoir. Finally, Father told the court he was unemployed because he was trying to establish legal status in this country.

Regardless of Father's citizenship status, he has a legal duty to support his children. *See Iliff*, 339 S.W.3d at 81 ("The law has long recognized parents have a legal duty to support their children during their minority."); *Yarborough v. Yarborough*, 290 U.S. 202, 221 (1933) ("[I]n order that children may not become public charges the duty of maintenance is one imposed primarily upon the parents, according to the needs of the child and their ability to meet those needs."). His testimony that he provided maintenance on the trucks when they broke down could reasonably be construed to mean that he was providing mechanical services despite his later

–15–

testimony to the contrary. Such an inference is also supported by his testimony that he provided maintenance for thirty hours per week, which the trial court could have determined was not consistent with just putting air in the tires and water in the water reservoirs. Evidence at trial established the wages of a diesel mechanic, and while Father claims that evidence was inadmissible, he does not provide any authority on appeal to support his position. We conclude the evidence supported the trial court's finding that Father was intentionally unemployed. Further, we conclude the evidence supports the trial court's assessment of child support on the basis Father was employed as a diesel mechanic. We overrule the second issue.

We affirm the trial court's order.

140773F.P05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF R.R. AND J.V., CHILDREN

No. 05-14-00773-CV

On Appeal from the 254th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF11-02361-R.
Opinion delivered by Justice Francis; Justices Bridges and Lang participating.

In accordance with this Court's opinion of this date, the trial court's Order In Suit To Modify Parent-Child Relationship is **AFFIRMED**.

It is **ORDERED** that appellee Bertha Ramirez recover her costs of this appeal from appellant Rogelio Villa a/k/a Jose Lopez.

Judgment entered October 6, 2015.